IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| LAVETA GILLISPIE on behalf of T.G., a minor child, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) CIV-06-699-C ) ) |
| MICHAEL J. ASTRUE, Commissioner of Social Security Administration,[1] | ) ) ) ) |
| Defendant. | ) ) |

REPORT AND RECOMMENDATION

Plaintiff seeks judicial review pursuant to 42 U.S.C. § 405(g) of the final decision of Defendant Commissioner denying her application for supplemental security income benefits under Title XVI of the Social Security Act on behalf of T.G., her minor child. Defendant has answered the Complaint and filed the administrative record (hereinafter TR___). The matter has been referred to the undersigned Magistrate Judge for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B), and the parties have briefed the issues. For the following reasons, it is recommended that the Commissioner's decision be reversed and remanded for further administrative proceedings.

---

[1]As of February 1, 2007, Michael J. Astrue became the Commissioner of the Social Security Administration. Pursuant to Fed. R. Civ. P. 25(d)(1) of the Federal Rules of Civil Procedure and 42 U.S.C. § 405(g), Michael J. Astrue is substituted for former Commissioner Jo Anne B. Barnhart as the Defendant in this suit.

1

I. Background

On March 10, 2003 (protective filing date), Plaintiff filed an application for supplemental security income benefits on behalf of her minor son, T.G., who was born on December 9, 1995. (TR 43-46, 83). Plaintiff's application alleged T.G. was disabled due to mental problems, abdominal pain, hearing loss, and a learning disability. (TR 55). In a written questionnaire filed with the agency, Plaintiff described T.G.'s physical and mental limitations, including a hearing loss in his left ear, hyperactivity, speaking too loudly, difficulty sleeping, behavior problems, learning problems, difficulty in running and walking, problems with cooperation and taking care of personal needs, and inability to maintain attention and complete homework and chores. (TR 65-74). Plaintiff identified an onset date of January 1, 1997, which Plaintiff related to the date on which T.G. was diagnosed as having elevated lead levels in his blood. (TR 43, 84).

The application was administratively denied. (TR 20, 21). At Plaintiff's request, a hearing *de novo* was conducted before Administrative Law Judge Weber ("ALJ") on July 26, 2005. (TR 274-301). At this hearing, Plaintiff testified that T.G. was 9 years old and had recently been promoted to the third grade. (TR 279). Plaintiff testified that T.G. was in special education classes for phonics, reading, math, and spelling, and that he had repeated the first grade. (TR 279-280, 294-295). According to his mother, T.G. was hospitalized and treated for lead poisoning in 1997. Plaintiff described T.G.'s continuing developmental delays and respiratory and abdominal/bowel problems that she related to the previous lead poisoning. (TR 282-288). She stated that T.G.'s most recent testing showed his blood lead level was above normal but had improved from the original level of lead poisoning found in 1997. (TR 294-295). T.G. did not testify at the hearing.

In a written decision issued on October 6, 2005, the ALJ found that T.G. had severe impairments due to borderline intellectual functioning and a learning disability but that these impairments did not meet, medically equal, or functionally equal the criteria for an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings"). Based on these findings, the ALJ concluded that T.G. was not disabled within the meaning of the Social Security Act. The agency's Appeals Council denied Plaintiff's request for review of the ALJ's decision (TR 4-6), and Plaintiff now seeks review of the final decision of the Commissioner embodied in the ALJ's determination.

II. Standard of Review

Judicial review of this Complaint is limited to determining whether the Commissioner's decision is based upon substantial evidence and whether the correct legal standards were applied. Emory v. Sullivan, 936 F.2d 1092, 1093 (10th Cir. 1991). "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." Musgrave v. Sullivan, 966 F.2d 1371, 1374 (10th Cir. 1992). Because "all the ALJ's required findings must be supported by substantial evidence," Haddock v. Apfel, 196 F.3d 1084, 1088 (10th Cir. 1999), the ALJ must "discuss[ ] the evidence supporting [the] decision" and must also "discuss the uncontroverted evidence [the ALJ] chooses not to rely upon, as well as significantly probative evidence [the ALJ] rejects." Clifton v. Chater, 79 F.3d 1007, 1010 (10th Cir. 1996). The court may not reweigh the evidence or substitute its judgment for that of the Commissioner. Hamilton v. Secretary of Health & Human Servs., 961 F.2d 1495, 1498 (10th Cir. 1992). However, the court must "meticulously examine the record" in order to determine whether the evidence in support of the Commissioner's decision is substantial, "taking into account whatever in the

record fairly detracts from its weight." Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004)(internal quotation omitted).

To be entitled to disability benefits, a child must have "a medically determinable physical or mental impairment or combination of impairments that causes marked and severe functional limitations, and that can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.906. Childhood disability claims are evaluated in a sequential three-step process that requires the ALJ to determine (1) whether the child is engaged in substantial gainful activity, (2) if not, whether the child has an impairment or combination of impairments that is severe, and (3) if so, whether the child's impairment or combination of impairments meets, medically equals, or functionally equals an impairment listed in Appendix 1, Subpart P of 20 C.F.R. Pt. 404. 20 C.F.R. § 416.924(a).

III. Plaintiff's Claims

Plaintiff contends that the ALJ ignored significantly probative evidence relevant to the functional equivalence determination, erred in failing to find that T.G.'s severe impairments resulted in marked functional limitations, and erred in failing to consider and determine the credibility of her testimony concerning her son's impairments.

IV. Functional Equivalence and Credibility

There is no dispute that Plaintiff satisfied the first two steps of the sequential evaluation process. At the third step of the determination process, the ALJ must consider whether the proven impairment or impairments, alone or in combination, meet, medically equal, or functionally equal an impairment set forth in the listings. 20 C.F.R. § 416.924(a). To make this determination, the ALJ must "consider all relevant information" in the case record, including

information from medical sources and nonmedical sources, such as parents, teachers, and other people who know the child. 20 C.F.R. § 416.924a(a).  The agency also must "try to get information from people who can tell [it] about the effects of [the child's] impairment(s) on [the child's] activities and how [the child] function[s] on a day-to-day basis," including information from parents, caregivers, teachers, and other school personnel. 20 C.F.R. § 416.924a(a)(2).

The ALJ found that T.G. had two severe impairments due to borderline intellectual functioning and a learning disability.  With respect to the issue of whether T.G.'s severe impairments meet or medically equal a listed impairment, the ALJ included the following rationale in his decision:

> The claimant is alleged to be disabled due to lead poisoning in 1997, which caused neurological damage, and the claimant's need for special education classes and weekly counseling.  The record shows that although the claimant has developmental delays, borderline intellectual functioning, and a learning disability, he attends special classes to assist him with such problems, participates in classroom and extra curricular activities, he has no problems with teachers or his peers, and he can bathe and dress himself.  The record also shows that the claimant suffers from asthma and complaints of abdominal pain; however, there is no evidence in the record that either of these complaints cause more than occasional limitations upon the claimant.
> Because the evidence fails to establish that the child's impairment(s) meets or medically equals a listed impairment, the undersigned must determine whether the child has an impairment (or combination of impairments) that is "functionally equal" to the listings and satisfies the 12-month duration requirement.

(TR 14).

The record contains the results of IQ testing of T.G. conducted in July 2003 by Dr. Pepper, a psychologist who conducted the consultative evaluation of T.G. for the agency. (TR 136-137).  Although the ALJ did not expressly refer to Dr. Pepper's report of his consultative

evaluation of T.G., the ALJ apparently relied on this testing with respect to the issue of T.G.'s intellectual functioning ability. According to Dr. Pepper, T.G.'s then-current level of intellectual functioning was in the borderline range, with a verbal IQ of 74, a performance IQ of 84, and a full scale IQ of 77. (TR 136).

At the time of Dr. Pepper's psychological evaluation of T.G., T.G.'s mother reported to Dr. Pepper that T.G. would be repeating the first grade (TR 136), and she testified at the administrative hearing that T.G. did indeed repeat the first grade. (TR 279-280). There is only one report in the record from T.G.'s school. In a school activity report completed in August 2003, after T.G.'s initial first grade year, the school's special education director reported that T.G. was in special class placement for phonics, reading, spelling, and math, that T.G. was about two grade levels below his peers in academic achievement, and that his "cognitive ability is very low." (TR 86). She also reported that T.G. had "attention problems" and could not "stay on task" in the classroom. (TR 86). Although T.G. had completed the second grade at the time of the hearing in July 2005, and his mother testified that he had been promoted to the third grade, there are no school records from his retained first grade year or his second grade year in the administrative record, and there is no evidence that the agency made any effort to procure T.G.'s highly relevant school records, despite the clear directive of agency responsibility for such procurement in 20 C.F.R. § 416.924a(a)(2). Nor did the ALJ cite in his decision which listings were considered in relation to T.G.'s severe impairments.

Plaintiff does not, however, urge that the Commissioner's decision be overturned due to the agency's failure to procure relevant school records for T.G. Moreover, Plaintiff does not dispute the ALJ's finding that T.G.'s impairments do not meet or medically meet an impairment

set forth in the listings. In her brief, Plaintiff focuses solely on the functional equivalence findings made by the ALJ.

In determining functional equivalence, the ALJ assesses all relevant factors, including (1) how well the child initiates and sustains activities, how much extra help the child needs, and the effects of structured or supportive settings; (2) how the child functions in school; and (3) how the child is affected by his or her medications or other treatment. 20 C.F.R. § 416.926a(a)(1)-(3). The ALJ considers how the child functions in his activities "in terms of six domains," including (1) acquiring and using information; (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for himself/herself, and (6) the child's health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). Functional equivalency is found if the impairment, or combination of impairments, results in "marked" limitations in at least two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a). A marked limitation is defined as one or more impairments that interfere seriously with the child's "ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). An extreme limitation is defined as one or more impairments that interfere "very seriously" with the child's "ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i).

Plaintiff contends that the ALJ erred in finding that T.G. had a less than "marked" limitation in the functional domains of acquiring and using information, attending and completing tasks, and interacting and relating with others. In explaining the finding that T.G. had less than a marked limitation in the domain of acquiring and using information, the ALJ referred to the IQ testing results and behavioral observations included in Dr. Pepper's July 2003

report. (TR 15). The ALJ also referred to the school activity report completed in August 2003 by the special education director at T.G.'s school. (TR 15). In explaining the finding that T.G. had less than a marked limitation in the domain of attending and completing tasks, the ALJ referred to the school activity report and to the report of a pediatric neurologist, Dr. Hyder, who evaluated T.G. in July 2002, when T.G. was 6 ½ years old. (TR 15, 102-104). In explaining the finding that T.G. had less than a marked limitation in the domain of interacting and relating with others, the ALJ referred to T.G.'s mother's testimony, to the comments of the special education director contained in the August 2003 school activity report, and to unidentified "physicians" reports. (TR 15-16).

In support of Plaintiff's claim of error, Plaintiff first refers to intelligence quotient ("IQ") test results completed in May 2000 by Dr. Nici. (TR 95-98). Plaintiff contends that the ALJ erred in ignoring this probative evidence of T.G.'s intellectual functioning. However, the regulations provide that IQ test results "must ... be sufficiently current for accurate assessment" of a child's intellectual ability, and that "IQ test results obtained before age 7 are current for 2 years if the tested IQ is less than 40 and 1 year if at 40 or above." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00(D)(10). The test results of IQ testing of T.G. conducted in May 2000 by Dr. Nici were too outdated for consideration by the ALJ, as the testing was completed five years prior to the administrative hearing. The ALJ did not err in failing to consider this outdated IQ testing with respect to the functional equivalence determination.

Dr. Pepper evaluated T.G. in July 2003. This testing was conducted more than two years before the ALJ issued his decision. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00(D)(10)(IQ test results obtained between ages 7 and 16 should be considered current ... for 2 years when the

IQ is 40 or above."). The ALJ relied on the IQ findings contained in Dr. Pepper's report to show T.G.'s intellectual ability without any express recognition that the regulations establish a cut-off date for consideration of such testing in childhood disability cases. Additionally, the only school report appearing in the administrative record regarding T.G.'s intellectual and functional abilities was prepared in August 2003, more than two years before the ALJ's decision was rendered. However, the ALJ did not acknowledge the obvious absence of relevant, current school information in the record with respect to T.G.'s functional abilities, particularly with respect to the domain of acquiring and using information. The notation on a single school activity report completed two years prior to the administrative hearing that T.G. attended regular classes in a few subjects and participated in classroom activities is not sufficient to show how T.G.'s abilities and limitations compared to those of children his age who do not have impairments.

Moreover, one of the methods for determining the existence of a marked limitation of functional ability is standardized testing that reflects scores that are "at least two, but less than three, standard deviations below the mean." 20 C.F.R. § 416.926a(e)(2)(i). An extreme limitation may be shown by a valid score that is three or more standard deviations below the mean. 20 C.F.R. § 416.926a(e)(3)(i). The report of Dr. Pepper of the IQ testing of T.G. contained no information with respect to standard deviations in the test results. Dr. Pepper reported only that in one area (picture arrangement) T.G. scored in the superior range, that in two areas (vocabulary and block design) T.G. scored in the normal range, and that in one area (coding) T.G. scored in the low normal range. (TR 136-137). Thus, the ALJ erred in failing to develop the record in this critical area.

Significantly, both Dr. Pepper's report and the sole school activity report appearing in the

record contained evidence that supports a finding of disability. Dr. Pepper reported that T.G. could not spell a word and could read only one word. (TR 137). Dr. Pepper also reported that T.G. did not maintain attention during testing, that questions often had to be repeated, and that testing was ended when T.G. became "resistant" to further testing. (TR 136). The special education director at T.G.'s school reported that T.G. had low cognitive scores and a low functioning ability, requiring his placement in special education classes for four subjects during the school day, as well as an attention deficit and inability to stay on task in the classroom. (TR 86-87).

The ALJ found that T.G. had less than a marked limitation in the domain of attending and completing tasks based on the rationale that the special education director's August 2003 report of T.G.'s progress "did not make any mention that would indicate a less than marked limitation." (TR 15). This explanation does not support the ALJ's finding in this critical domain. The ALJ also refers to the report of Dr. Hyder, a pediatric neurologist who evaluated T.G. in July 2002. (TR 102-104). Dr. Hyder stated in his report of the clinical evaluation that T.G. exhibited hyperactivity, mild language delay, and mild left lower extremity ataxia with two beats of left ankle clonus. (TR 104). With respect to T.G.'s attentiveness, Dr. Hyder noted that T.G.'s "attention was easily distracted, but when asked to do something specifically, he could concentrate on the task." (TR 103). Although Dr. Hyder's statement indicates that T.G.'s concentration was not impaired during this clinical evaluation, the ALJ's finding is not supported by substantial evidence in the record, considering the other evidence in the record reflecting T.G.'s attention deficits during school activities and during Dr. Pepper's psychological evaluation. Another psychologist who evaluated T.G. in May 2000, Dr. Nici, stated that T.G.

was hyperactive and that he should be monitored and re-evaluated for possible attention deficit hyperactivity disorder ("ADHD") in the future. (TR 101). Significantly, Dr. Nici noted that although T.G. "was attentive with one-on-one adult interaction, ... many children with ADHD are." (TR 101). Thus, Dr. Nici's report casts doubt on the significance of Dr. Hyder's statement regarding T.G.'s ability to concentrate in a one-on-one clinical evaluation given the other evidence in the record that T.G.'s ability to concentrate and complete tasks in his usual school environment is significantly impaired. Additionally, T.G.'s mother testified that he remained attentive for only three or four minutes and required significantly longer periods of time to complete homework than the homework should have required. The ALJ erroneously failed to mention or provide reasons for ignoring this highly relevant testimony in his determination of T,G's functional abilities and limitations in this area. See Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996)(although ALJ need not discuss all of the evidence of record, he may not ignore evidence that does not support his decision, particularly when that evidence is "significantly probative").

With respect to the ALJ's finding of a less than marked limitation in the domain of interacting and relating with others, the ALJ mentioned T.G.'s mother's testimony at the hearing that T.G. exhibited behavioral problems in relating to other children, including an incident where he hit another child on the school bus and an incident where he threw a tray of food in the school cafeteria, and that T.G. was receiving weekly counseling at his school. (TR 16). However, the ALJ did not find this testimony compelling with respect to T.G.'s functional limitations because "physicians who have seen [T.G.] have not mentioned any type of behavioral problem which affects [T.G.'s] ability to interact with other people." (TR 16). This vague rationale does not

support the ALJ's finding because the ALJ does not refer to specific evidence in the record showing that T.G.'s functional ability with respect to his interaction with other people was observed or evaluated. See 20 C.F.R. § 416.926a(i)(1)(interacting "means initiating and responding to exchanges with other people, for practical or social purposes" and relating to other people "means forming intimate relationships with family members and with friends" who are the child's age, "and sustaining them over time"). Although the special education director at T.G.'s school reported that T.G. had no problems interacting with his peers during his first grade school year, his mother testified that more recently he threw a food tray at a cafeteria worker, hit his cousins, hit a boy on the school bus, and "hits on his dogs." (TR 296-297). The ALJ did not provide a specific reason for discrediting this testimony regarding T.G.'s interaction with other people. The decision must be remanded for another perhaps more significant reason, however, in light of the ALJ's error in making a credibility determination. The ALJ's decision provides only this brief statement with respect to credibility:

> The child's subjective complaints are considered credible only to the extent they are supported by the evidence of record as summarized in the text of this decision.

(TR 18). "If the child claimant is unable to adequately describe his symptoms, the ALJ must accept the testimony of the person most familiar with the child's condition." Briggs v. Massanari, 248 F.3d 1235, 1239 (10th Cir. 2001)(citing 20 C.F.R. § 416.928(a)). "In such a case, the ALJ must make specific findings concerning the credibility of the parent's testimony, just as he would if the child were testifying." Id. The ALJ in this case set forth only a boilerplate reason for disregarding the nonexistent testimony of T.G. The ALJ mentioned T.G.'s mother's testimony only once, with respect to T.G.'s functional abilities in one area, and did not provide

sufficient rationale for disregarding T.G.'s mother's testimony which was supported by portions of the record. Accordingly, this error, along with the previously-described errors, requires reversal of the Commissioner's decision and a remand for further administrative proceedings consistent with this Report and Recommendation.

## RECOMMENDATION

In view of the foregoing findings, it is recommended that judgment enter REVERSING the decision of the Commissioner to deny Plaintiff's application for benefits and REMANDING for further administrative proceedings. The parties are advised of their respective right to file an objection to this Report and Recommendation with the Clerk of this Court on or before April 23rd, 2007, in accordance with 28 U.S.C. § 636 and LCvR 72.1. The parties are further advised that failure to file a timely objection to this Report and Recommendation waives their respective right to appellate review of both factual and legal issues contained herein. Moore v. United States, 950 F.2d 656 (10th Cir. 1991).

This Report and Recommendation disposes of all issues referred to the undersigned Magistrate Judge in the captioned matter, and any pending motion not specifically addressed herein is denied.

ENTERED this   2nd   day of   April  , 2007.

*[signature]*
GARY M. PURCELL
UNITED STATES MAGISTRATE JUDGE